IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Beverly Hardaway, | Case No. 3:14 CV 1418 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER DENYING |
| -vs- | SUMMARY JUDGMENT |
| City of Toledo, et al., | JUDGE JACK ZOUHARY |
| Defendants. | |

## INTRODUCTION

In October 2013, seventeen-year-old M.H. called Toledo 911 from the lobby of a grocery store, explaining that he could not gain entry to the home of his then-foster mother, Plaintiff Beverly Hardaway. M.H. told dispatch he had called Hardaway, who told him to go to Children Services and not return home (Doc. 44 at 0:30 – 0:34). Defendant Michael Smith, a Toledo police officer, responded and drove M.H. to Hardaway's home, just over a block away. During the drive, M.H. again said that Hardaway had locked him out of the house. After talking with Hardaway, Smith arrested her for child endangerment.

But as it happens, almost nothing M.H. said that night was true. A state trial court found Hardaway not guilty of child endangerment, and she now sues Smith, alleging he arrested her without probable cause and used excessive force in making the arrest. Smith responds with a Motion for Summary Judgment (Doc. 43). For the reasons below, this Court denies the Motion.

## BACKGROUND

Because this Court must focus on the facts Smith knew at the time he arrested Hardaway, the narrative begins with Smith's arrival at the grocery store, where M.H. climbed into his cruiser's backseat for the brief ride home. "When I got there he said that he was locked out. He had went home

and tried to get in and no one would let him in" (Doc. 36 at 9). M.H. explained that Hardaway had locked him out because he had missed his curfew by an hour and a half (*id*. at 11, 13). M.H. claimed he stood at the Hardaway home's front door and knocked "continuously for an hour" (*id*. at 12).

During the drive, Smith guessed that M.H. suffered from some form of mental illness. "His demeanor, um, the way he spoke. You speak to him for a minute you just kind of get the vibe that he's off" (*id*. at 15–16). Smith's intuition was correct. According to Smith, prior to the arrest, Hardaway revealed that M.H. is schizophrenic (*id*. at 36). Hardaway also mentioned M.H.'s "medication," though Smith denies that Hardaway further explained M.H. took psychotropics for his illness (*id*. at 33).

Officer Melissa Stephens arrived at the Hardaway home to assist on the call, arriving soon after Smith (Doc. 37-1 at 4). She spoke with Smith briefly by his patrol car and learned the game plan: "Officer Smith was going to speak with [Hardaway] and I'm more or less assisting him to speak with her and see what happened as to why [M.H.] wasn't in the house or to verify his story" (*id*.).

With M.H. still in the patrol car, the two officers approached the Hardaway home and knocked on the front door (*id*.). Twenty-year-old David Rodriguez answered the door. Stephens says "the first thing David said was you must be here about [M.H.] and I believe Officer Smith asked for the foster mother. So he said he would get her" (*id*. at 5). Rodriguez invited both officers into the house and fetched Hardaway, who appeared wearing a bathrobe (*id*.).

The discussion that followed occurred in the home's front living room, where Hardaway, Smith, and Stephens stood, with Rodriguez close by in the adjacent foyer. Hardaway and Smith tell very different stories about what happened next.

**Hardaway is Arrested**

*Hardaway's Version of Events*.  Hardaway consistently states she did not refuse M.H. entry to her home, either before M.H.'s call to 911 or in Smith's presence (*see, e.g.*, Doc. 32 at 41).  She locks her doors every night out of habit and not because M.H. had missed curfew.  "I've [served as a foster parent] for 22 years and I have five [former foster children] in prison right now for murder.  The kids come back, they rob, they sleep in the back yard and I lock my door every night" (*id*. at 36).

However, Hardaway did know that M.H had missed curfew.  She had reported that fact to Children Services by phone (*id*. at 38).  Because M.H. commonly missed curfew, Children Services told Hardaway to phone the agency when he returned (*id*. at 39).  Hardaway also called M.H.'s biological mother because her apartment was a common stopping point for M.H. when he ran away from his foster home or broke curfew (*id*. at 37).

Smith does not suggest that Hardaway created a substantial risk to M.H.'s safety by (for example) not searching for M.H. on her own.  In the past, when M.H. failed to return home, Hardaway would drive around Toledo visiting M.H.'s normal haunts.  But because these nighttime trips took her to notoriously dangerous housing complexes, Children Services specifically ordered Hardaway not to seek out M.H. in this way.  Instead, she should wait for M.H. to call for a ride, then tell M.H. to head to Children Services where he would be picked up (*see id*. at 31–32).

Despite her phone calls, Hardaway had no luck locating M.H.  Before she went to sleep, she gave Rodriguez permission to let M.H. in the house.  She instructed Rodriguez to wake her when M.H. returned, so she could give him medication (Doc. 35 at 16, 18).  Rodriguez stayed up late playing video games (*id*. at 17).  Hardaway says she did not want M.H. taken to Children Services (Doc. 32 at 39); she wanted him home.

3

But Hardaway claims she never had the chance to tell Smith any of this. When the officers arrived, she initially panicked. The police had brought M.H. home in the past after he had run away. But officers would always bring M.H. to the door. This time, Smith and Stephens were alone. "[W]hen I saw the officers for the first time and no [M.H.] I thought maybe they were coming to bear some bad news" (*id*. at 40).

Rodriguez recounts what happened next. Smith "instantly" asked "what is all this about you not letting [M.H. in?]" (Doc. 35 at 19). Hardaway began to explain that she had not refused to let M.H. in the house, but Smith "cut[] her off" and called her a "liar" (*id.*). Hardaway asked Smith to call a nearby district police station to confirm M.H.'s history of running away from home and breaking curfew, but Smith again cut her off (*id*.). "Then [the discussion] came to a point where my ma said Dave, could you bring his meds to me, please? And [Smith's] like don't bring me a fucking thing" (*id*.).

Smith never asked if Hardaway would let M.H. back in the house. Hardaway says the closest statement Smith made to such a request occurred as Hardaway tried to explain that she had not locked M.H. out. Smith then said, "how's about I go get [M.H.] so you can lie to his face" (Doc. 32 at 41).

At that point, Rodriguez approached Smith, saying (Doc. 35 at 21):

[W]ell, excuse me Officer, maybe you're just not understanding. That's when [Smith] kind of just lost it. He turned around and put his finger so close to my face that it could have kinetic energy between us, you know, he's almost touching me. . . . that's when he [said], 'you get fucking back, this is none of your damn business.'

Hardaway told Rodriguez to take a step back, which he did, and Hardaway asked Smith for his badge number (*id*. at 21–22):

4

> [A]s soon as my ma says I need all your information, [Smith said] 'oh, oh, yeah? Well, you're under arrest for child endangerment.' And that's when he goes over there, he yanks her up from her arm, pushes her into her [living room's] glass tables and makes [the decorative glass that sat on the table] chime, I don't know, she got all types of glass everywhere.

Hardaway says that, immediately after she told Smith she was "not intimidated" by him, Smith grabbed her under her armpit (Doc. 32 at 43–44, 51, 53–54, 79–80). Hardaway did not resist (Doc. 35 at 25; Doc. 37 at 14). She noticed her cut leg after she had been booked into the Lucas County Jail (Doc. 32 at 47). Bruising to her armpit area developed later (*see id*. at 48).

Throughout this confrontation, Officer Stephens stood next to Smith. She confirms that Hardaway and Smith's discussion was brief, agreeing that "Ms. Hardaway didn't really say much when [Stephens was] in her presence" (Doc. 37 at 8). Stephens could not recall Hardaway refusing custody of M.H. (*id*. at 12). And contrary to Smith's testimony, Stephens does not recall Hardaway telling officers that M.H. should be sent to Children Services (*id*. at 24).

Instead of refusing M.H. entry to the house, Stephens says Hardaway asked "several times" if she could "explain her side," stating M.H. "was not being honest" with the officers (*id*. at 9, 11, 16, 18). Stephens says Smith responded that "he would bring [M.H.] in and let her say that [M.H.] was a liar to h[is] face" (*id*. at 18). Smith never allowed Hardaway a chance to explain her side of the story (*see id*. at 19).

***Smith's Version of Events***. Smith says he began his conversation with Hardaway by asking if she knew where her foster son was; she replied M.H. had run away. Smith told Hardaway that was not true because M.H. was sitting in the back of his patrol car because he was locked out (Doc. 36 at 26–27). Smith suggested "I can bring [him in the house] and we can straighten it out" (*id*. at 27). "She said *not* to bring him in, that she wanted him to go to" Children Services (*id*.) (emphasis added).

5

"[S]he *refused* [to let M.H. into the house.] She said that he didn't need to come in, he needed to go to" Children Services (*id*. at 28) (emphasis added). Smith insisted Hardaway had to take custody of her foster son; Children Services was not an option (*id*. at 28–29).

Hardaway continued to refuse custody (*id*. at 31). She asked Smith to call a police district station to confirm M.H. had a history of running away from home (*id*. at 32). She also told Rodriguez to retrieve M.H.'s medication -- Rodriguez did -- though Smith did not ask and was not told what type of medication M.H. took (*id*. at 32–33). Smith denies that, at this point, he cussed at Rodriguez (*see id*.).

Hardaway and Smith then briefly discussed M.H.'s mental illness. Smith testified that Hardaway said M.H. suffered from schizophrenia and "that he had medication" (*id*. at 35–36). After learning of M.H.'s illness, Smith said "that would be even more reason not to keep him locked out" (*id*. at 36–37).

Smith eventually "cut off" Hardaway after she continued to ask him to call the police district station (*id*. at 38). She had become "mildly aggressive," raising her voice (*id*. at 40). He then presented Hardaway with her choice for a final time: "I had basically put it point blank to her that you have to take possession of him or you will be charged" (*id*. at 41). "[S]he told me that she didn't care, I don't intimidate her, she knows a lawyer" (*id*. at 42).

Smith arrested Hardaway (*id*. at 43). As Smith touched her to apply handcuffs, she became startled, lost her balance, and began to fall, but Smith kept her from falling by holding on to her arm (*id*. at 43–44). At the same time, Rodriguez began to approach Smith in an aggressive posture; Smith told Rodriguez to "get the fuck back" (*id*. at 50, 51, 54–55). Smith denies lifting Hardaway by the armpit and dragging her into the living room coffee table. Stephens likewise recalls no use of force

(Doc. 37 at 13, 19). Stephens did not see Hardaway struggle with Smith or lose her balance during the arrest (*id*. at 14–15).

## STANDARD OF REVIEW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). The court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court may not weigh the evidence or determine the truth of any matter in dispute. Rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). The doctrine of qualified immunity shields from civil liability government officials who perform discretionary functions if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks omitted).

## DISCUSSION

**Fourth Amendment Seizure**

Hardaway stipulated to dismissal of the Complaint's malicious prosecution claim (*see* Doc. 28). Even so, Smith's Motion addresses probable cause in the context of that dismissed claim (*see, e.g.*, Doc. 43 at 10, citing *Worley v. Columbia Gas of Ky., Inc.*, 491 F.2d 256, 262 (6th Cir. 1973)). To the extent his Motion depends on the legal premise that Hardaway can only present her case to a jury if she makes a "clear showing" that Smith lacked probable cause, that legal error is reason enough to deny summary judgment. The "clear showing" standard is a product of Kentucky malicious prosecution case

7

law, not federal law. *See Puckett v. Clark*, 410 S.W.2d 154, 157 (Ky. 1966) (explaining that because "public policy favors the exposure of crime, and malicious prosecution actions are not favored in the law, a plaintiff has the burden of making a clear showing of no probable cause").

Still, this Court has reviewed the record in light of Hardaway's unreasonable seizure claim and case law relevant to that claim. "Whether that arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it -- whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).

> [A]n officer does not have to investigate independently every claim of innocence. But, this axiom does not suggest that an officer has *no* duty to investigate an alleged crime before making an arrest. A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime. And, in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest.

*Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphases in original) (citations omitted). Probable cause is generally a jury question "unless there is only one reasonable determination possible." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (quotation marks omitted).

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Smith arrested Hardaway for recklessly "creat[ing] a substantial risk to the health or safety" of M.H. "by violating a duty of care, protection, or support" she owed M.H. as his foster mother. OHIO REV. CODE § 2919.22(A); *see also State v. O'Brien*, 30 Ohio St. 3d 122, 125 (1987) (explaining the offense includes a recklessness mens rea not mentioned in the statute).

8

Two possible bases exist for Smith's probable cause determination: "Plaintiff's failure to let [M.H.] back into the home" (Doc. 43 at 5), or M.H.'s statements to dispatch and to Smith to the effect that Hardaway locked him out of the house and told him not to return because he broke curfew (*see id.* at 4).

***Hardaway's conversation with the officers does not compel summary judgment.*** Hardaway denies that she refused to take custody of M.H. Her version of events creates a jury question as to whether, based on Smith's discussion with Hardaway, a reasonably prudent officer would believe Hardaway had recklessly placed M.H. in harm's way. Smith ignores this version of events. For purposes of the unreasonable seizure claim, his Motion entirely depends on the officers' testimony.

Here is the version of events which Smith's Motion ignores: Upon meeting Hardaway, Smith immediately and angrily accused her of locking M.H. out of her home. Hardaway denied that accusation and tried to explain that M.H. had lied to Smith. Smith replied with a sarcastic offer to fetch M.H. so that Hardaway could lie to his face. According to Stephens, Smith never allowed Hardaway a chance to explain herself. Even though Smith knew M.H. was schizophrenic, he refused to consider the type of medication M.H. took. And far from asking Hardaway "point blank" to let M.H. into the house or be arrested, Smith arrested Hardaway immediately after she asked for his badge number and told him she was not intimidated by him, without ever asking Hardaway to take custody of M.H. Other than Smith, no one on the scene testified that Hardaway refused custody of M.H. And while it is true in a literal sense that Hardaway "fail[ed] to let [M.H.] back into the home" before she was arrested (*id.* at 5), that was only because Smith quickly arrested Hardaway.

Hardaway's version of events does not resemble either of the two cases Smith cites as support for summary judgment (*see id.* at 12). In *State v. Morton*, 138 Ohio App. 3d 309, 313 (2000), the court

9

rejected a sufficiency-of-the-evidence challenge to a child endangerment conviction, noting the defendant locked a three-week-old child "in a van for thirty to forty minutes on a hot summer day" on the reckless assumption that another adult or child had removed the newborn from the van and was tending to the baby. *See also City of Cleveland v. Kazmaier*, 2004-Ohio-6420, ¶ 18 (Ct. App.) (affirming child endangerment conviction of defendant who forced a mother and daughter out of a home into "sub-freezing temperatures and locked the door to prevent re-entry").

Here, Smith does not argue that Hardaway's habit of locking her doors at night is reckless. Smith instead relies on his recollection that Hardaway refused to take custody of M.H. and admitted to locking him out for missing curfew. Hardaway's testimony contradicts both of those allegations. On Hardaway's version of events, Smith did not have reasonably trustworthy information that showed a "*strong possibility* that [M.H.] would suffer a detriment to his . . . health" because of something Hardaway did. *City of Eastlake v. Corrao*, 2003-Ohio-2373, ¶ 17 (Ct. App.) (emphasis in original).

***M.H.'s statements to Smith do not compel summary judgment***. That leaves Smith's undisputed testimony about his conversations with M.H., who told Smith that Hardaway locked him out of the house for missing curfew. Eyewitness or victim testimony "will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness [or victim] was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quotation marks omitted); *see also* Doc. 45 at 15.

Here, for at least three reasons, reasonable minds could differ about whether M.H.'s statements were "reasonably trustworthy": M.H was a child, Smith had no evidence corroborating M.H.'s accusation and, most important, Smith was told before the arrest that M.H. was schizophrenic. *See*

10

*Wesley v. Campbell*, 779 F.3d 421, 429, 430, 432 (6th Cir. 2015); *see also Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (explaining that a prudent officer should consider the uncorroborated allegations of an "an interested party involved in a contentious dispute . . . in a skeptical light" in the course of considering an arrest). Hardaway has presented a jury question on whether Smith had probable cause to arrest her.

***Smith is not entitled to qualified immunity as a matter of law.*** Smith raises qualified immunity defenses to both remaining claims. But he does not develop a qualified immunity argument with respect to the unreasonable-seizure claim. He has forfeited any such argument for purposes of summary judgment. *Cf. United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006). Further, the argument would fail at this stage. The relevant right was clearly established at the time of Hardaway's arrest. *See Gardenhire*, 205 F.3d at 313. And it is objectively unreasonable for a police officer to credit the uncorroborated claims of a child who the officer knows to be schizophrenic, while at the same time refusing the child's custodian a chance to explain her side of the story or asking the custodian to accept custody of the child before placing her under arrest. *See Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999).

**Fourth Amendment Excessive Force**

A police officer's right to make an arrest "carries with it the right to use some degree of physical coercion or threat thereof to effect" the arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Whether police use of force is reasonable depends on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [t]he [suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* This Court considers each factor

"from the perspective of a reasonable officer on the scene," and may not engage in second-guessing through hindsight. *Miller v. Sanilac Cnty.*, 606 F.3d 240, 251, 256 (6th Cir. 2010).

Smith does not argue the force he used to arrest Hardaway was necessary to overcome a danger Hardaway posed to Smith or Stephens. Rather, Smith contends a reasonable officer would think that amount of force appropriate because M.H.'s "well being was threatened . . . as a result of being locked out of the house by the plaintiff, . . . [and because] Mr. Rodriguez intended to physically interfere with the arrest of the plaintiff" (Doc. 43 at 8–9).

The first argument is meritless -- throughout the confrontation, M.H. sat in the back of Smith's patrol car, and Smith does not explain why yanking a foster mother into a table is necessary to protect a foster child already in police custody away from the scene of the confrontation. The second argument ignores a key factual dispute -- Rodriguez says he approached Smith with the intention of explaining M.H.'s history of running away. Smith then told Rodriguez to "get the fuck back." Hardaway followed up by telling Rodriguez to leave the room, which he did. She then asked for Smith's badge number. According to Rodriguez and Hardaway, *only then* did Smith grab Hardaway. Accepting Hardaway's version of events, Rodriguez did not attempt to interfere with Hardaway's arrest. A jury could find that the force Smith applied was excessive under the circumstances, when Hardaway had not resisted arrest, Rodriguez had walked away from the confrontation before the arrest, and the alleged crime was relatively minor.

"[T]he right to be free from physical force when one is not resisting the police is a clearly established right." *Goodwin v. City of Painesville*, 781 F.3d 314, 328 (6th Cir. 2015) (quotation marks omitted). If a jury accepts Hardaway's version of events, a reasonable officer in "Smith's position could [not] have believed that force was necessary to protect [M.H. or] himself" (Doc. 43 at 9).

12

"Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Gradisher v. City of Akron*, 794 F.3d 574, 586 (6th Cir. 2015) (quotation marks omitted).

## CONCLUSION

For these reasons, this Court denies Smith's Motion for Summary Judgment (Doc. 43).

IT IS SO ORDERED.

                                                                                    s/ *Jack Zouhary*
                                                                                  JACK ZOUHARY
                                                                                  U. S. DISTRICT JUDGE

                                                                                  September 29, 2015